641 F.Supp. 1570 (1986)
UNITED STATES of America, Plaintiff,
v.
Jerry Wayne WOOLBRIGHT and Lisa Anne Randle, Defendants.
No. 86-128CR(1).
United States District Court, E.D. Missouri, E.D.
August 29, 1986.
*1571 James Porter, Federal Public Defender, St. Louis, Mo., for Randle.
Norman S. London and Larry Fleming, St. Louis, Mo., for Woolbright.
Debra E. Herzog, Asst. U.S. Atty., St. Louis, Mo., for plaintiff.

MEMORANDUM
NANGLE, Chief Judge.
This case is before the Court on the motions to suppress of defendants Woolbright and Randle.
*1572 St. Louis County Police Officer Timothy Nisbet and several officers from the Florissant Police arrested defendants Jerry Wayne Woolbright and Lisa Anne Randle, along with Steve Wilson and Midnight Bobby Dolan, at the Harley Hotel in Earth City at approximately 3:30 a.m., May 20, 1986. At the time of the arrest, the officers seized several thousand dollars and four (4) pieces of luggage from Woolbright's possession. Lisa Anne Randle later identified one of those pieces of luggage as her property. Sometime around 11:00 a.m. the same day, Officer Nisbet searched and inventoried the contents of the luggage seized from Woolbright. The luggage contained large quantities of cocaine, amphetamines, valium, and drug paraphenalia (including syringes), as well as personal effects and several bottles of insulin[1]. The grand jury indicted Woolbright for possession with intent to distribute cocaine, for possession with intent to distribute methamphetamine, and for interstate travel to facilitate an unlawful activity to-wit: distribution of controlled substances. The grand jury indicted Randle for possession with intent to distribute methamphetamine.
Defendant Woolbright filed a motion to suppress the evidence seized from his luggage. Defendant Randle filed a motion to suppress statements she made after her arrest and evidence seized from the luggage she identified as her property. United States Magistrate Robert D. Kingsland held a suppression hearing on June 20, 1986. Magistrate Kingsland recommended to this Court the suppression of the items seized from Woolbright's luggage and the suppression of Randle's statements. The Court rejects the Magistrate's recommendation as to Woolbright and orders that defendant Woolbright's motion to suppress be and is denied. The Court accepts the Magistrate's recommendation as to Randle and orders her statements suppressed. The Court further orders that defendant Randle's motion to suppress evidence seized from the luggage Randle identified as her property be and is denied.
Sometime in the afternoon of May 19, 1986, a man with purple streaks in his hair and three (3) earrings in one ear delivered the dead body of a young woman to Christian Northwest Hospital in Florissant, Missouri. This man with purple hair left the hospital before police could make any inquiries. Florissant Police began investigating the circumstances surrounding the woman's death at around 5:30 p.m., May 19, 1986. [Tr. 10-12]. Florissant Police identified the dead woman as Amy Creeley and determined that she was the live-in girlfriend of Steven Wilson. [Tr. 12, 25]. The Florissant Police knew that Steven Wilson was a convicted drug dealer. They suspected death by drug overdose. [Tr. 11-12].
In the early morning hours of May 20, 1986, St. Louis County Police Detective Robert Kenney was working secondary employment at the Harley Hotel in unincorporated St. Louis County. Detective Kenney was attached to the Narcotics Division of the St. Louis County Police. Detective Kenney was aware that the Florissant Police were investigating the suspicious death of Amy Creeley which had occurred on the previous day, May 19, 1986. [Tr. 9-10]. At 2:30 a.m. on May 20, 1986, Detective Kenney contacted by radio Police Officer Timothy Nisbet of the Robbery/Homicide Section of the Crimes Against Persons Unit of the St. Louis County Police. Officer Nisbet telephoned Detective Kenney at the Harley. [Tr. 9-10, 30-31]. Detective Kenney informed Officer Nisbet that Florissant Police were seeking a man with purple hair in connection with a suspicious death. He further informed Officer Nisbet that a man with purple hair had come to the Harley and gone to Rooms 819 & 821. [Tr. 10].
Officer Nisbet proceeded to the Harley, arriving there at 2:45 a.m. [Tr. 12, 31]. Detective Kenney told Officer Nisbet that the persons in Rooms 819 & 821 were suspicious, that the man with the purple hair was in there, and that he thought Jerry Woolbright, another man, and a woman *1573 were in there. [Tr. 12]. Officer Nisbet was familiar with Jerry Woolbright and his connections to homicides and narcotics. [Tr. 16]. Florissant Police arrived at 3:00 a.m. [Tr. 12]. Officer Nisbet and the Florissant Police began watching Rooms 819 & 821. [Tr. 13, 31].
Around 3:15 a.m. Lisa Randle exited from Room 821. Upon confrontation by the police officers, Ms. Randle stated "Bob didn't know this girl. He was driving through a park and she was having convulsions, so he took her to the hospital." [Tr. 15]. A couple of minutes later, the man with the purple hair exited from Room 821 carrying a bag. Two more men exited from Room 821 carrying luggage out. [Tr. 16]. The three men headed hurriedly towards the stairs with the luggage. [Tr. 18].
The officers identified themselves as police officers and told the three men to stop. [Tr. 18, 42]. The men stopped and turned towards the officers. When Woolbright turned around, Officer Nisbet recognized him. [Tr. 19, 41]. The officers frisked the three men for weapons. They found a large wad of money on Woolbright. [Tr. 19]. Officer Nisbet saw syringes in a plastic bag carried by the man later identified as Steven Wilson, the live-in boyfriend of the deceased. [Tr. 21-22]. The officers arrested the three men and Ms. Randle for suspicion of the murder of Amy Creeley. [Tr. 20-21]. The man with the purple hair was subsequently identified as Midnight Bobby Dolan. [Tr. 39]. The officers seized the luggage in possession of Woolbright and the other arrestees. [Tr. 45].
The Florissant Police informed Officer Nisbet that they wanted to convey the suspects to the Florissant Police Station. However, the Harley is not within the Florissant jurisdiction. Therefore, Officer Nisbet conveyed the suspects to the St. Louis County Police Department Detective Bureau Building on South Central Avenue in Clayton, Missouri. [Tr. 20-21, 39]. The Florissant Police obtained teletypes for murder first degree questioning of the four arrestees. [Tr. 20-21].
Upon arrival at the St. Louis County Detective Bureau at 4:15 a.m. [Tr. 33], Dectective Nisbet placed each prisoner in a separate room for questioning. [Tr. 21]. The luggage was placed in Room 226, the Supervisor's room. Room 226 was locked and guarded, though several officers had access to the room. [Tr. 21, 45-47]. The suspects were not booked upon arrival at the St. Louis County Detective Bureau. [Tr. 37].
Around 4:15 a.m., Nisbet began questioning the suspects. He interviewed Randle first, then Midnight Bobby Dolan (the man with the purple hair), and then Woolbright. [Tr. 24]. Nisbet questioned Woolbright at around 6:00 a.m. [Tr. 34]. Woolbright asked for an attorney and indicated that he needed to go to a hospital because he is a diabetic. Woolbright was taken to St. Louis County Hospital and was returned to the Detective Bureau at around 8:00 a.m. [Tr. 34]. At around 8:00 a.m., FBI Agent Crowley arrived at the Detective Bureau. [Tr. 36]. Crowley and Nisbet interviewed Steven Wilson. [Tr. 37]. By 10:00 a.m. Crowley and Nisbet had learned from Wilson the following: (1) Amy Creeley (the deceased) died in Hazelwood, Missouri; (2) Wilson had injected Amy Creeley with cocaine in her thigh; (3) Wilson knew that Creeley died from a cocaine overdose; (4) Woolbright had supplied Wilson with the cocaine; (5) Wilson telephoned Woolbright after Amy Creeley died to obtain help in disposing of her body; and (6) at Woolbright's request, Midnight Bobby Dolan (the man with the purple hair) used the victim's car to take her body to the hospital in Florissant. [Tr. 25-26].
Nisbet determined that the jurisdiction of the murder had changed from Florissant to Hazelwood. Therefore, the Florissant Police cancelled their teletypes and the Hazelwood Police issued teletypes. [Tr. 26]. Between 10:00 a.m. and 11:00 a.m. the officers completed their prisoner interviews. [Tr. 27].
At around 11:00 a.m., Officer Nisbet commenced the process for transferring the prisoners to the Department of Justice *1574 Services of St. Louis County for booking on state charges related to the death of Amy Creeley. Officer Nisbet searched and inventoried the luggage seized from Woolbright. The luggage had been locked in Room 226 since 4:15 a.m. [Tr. 27]. The search of the luggage revealed large quantities of controlled substances. [Tr. 29-30]. Upon discovery of the drugs, instead of transferring Woolbright to Justice Services for booking, Officer Nisbet released Woolbright to the FBI for the filing of federal drug charges. Woolbright was never booked on any state charges relating to the death of Amy Creeley. [Tr. 37-38].
Officer Nisbet did not attempt to obtain a search warrant prior to searching the luggage. [Tr. 53]. The Government attempts to justify the search of Woolbright's luggage without a search warrant as an Illinois v. Lafayette, 462 U.S. 640, 103 S.Ct. 2605, 77 L.Ed.2d 65 (1983), inventory search incident to his arrest, booking, and incarceration. This Court finds that the search was a reasonable inventory search.
A valid inventory search requires initially a valid arrest. 462 U.S. at 643, 103 S.Ct. at 2608. Officer Nisbet had probable cause to make a warrantless arrest at the Harley of Woolbright, Randle, Wilson, and Dolan for suspicion of murder. The totality of facts and circumstances within the combined knowledge of the officers present at the Harley were sufficient to warrant a prudent man in believing that Woolbright, Randle, Wilson and Dolan had committed crimes relating to the apparent drug overdose death of Amy Creeley. See United States v. Rose, 731 F.2d 1337, 1342 (8th Cir.), cert. den., 469 U.S. 931, 105 S.Ct. 326, 83 L.Ed.2d 263 (1984).
Based upon (1) the delivery of the dead body by a man with purple hair; (2) the presence of a man with purple hair at the Harley; (3) Lisa Randle's statement in the hallway about Bob and the dead girl; (4) the officer's knowledge of Woolbright's and Wilson's narcotics connections; (5) the behavior of the four in the hallway (narcotic state and apparent intent to depart); (6) the officer's recognition of Woolbright; (7) the syringes visible in Wilson's possession; and (8) the drug involvement in Amy Creeley's death, Nisbet had probable cause to arrest Jerry Woolbright and Lisa Randle.
With respect to the propriety of the search of Woolbright's luggage at 11:00 a.m., the Magistrate determined alternatively (1) "that the so-called inventory search was not an inventory search within the meaning of Illinois v. Lafayette," and (2) that, as an inventory search, this "inventory search was not reasonable as it did not comply with the `routine procedure incident to incarcerating an arrested person,' as required by Illinois v. Lafayette."
In Illinois v. Lafayette, 462 U.S. 640, 103 S.Ct. 2605, 77 L.Ed.2d 65 (1983), the United States Supreme Court held that under the Fourth Amendment "it is not `unreasonable' for the police, as part of the routine procedure incident to incarcerating an arrested person, to search any container or article in his possession, in accordance with established inventory procedures." 462 U.S. at 648, 103 S.Ct. at 2611. The police may conduct the inventory search without probable cause and without obtaining a search warrant. 462 U.S. at 643, 103 S.Ct. at 2608.
Officer Nisbet testified that he arrested Woolbright for the murder of Amy Creeley. Woolbright was brought to the Detective Bureau at 4:15 a.m. However, the search of his luggage did not occur until 11:00 a.m. Further, Officer Nisbet did not book Woolbright prior to or contemporaneously with the inventory search. In addition, Steven Wilson had already confessed to the murder. These factors create two potential problems. First, was the search pretextual and not an inventory search incident to arrest and incarceration? Second, was the inventory search unreasonable?
Upon arrest the officers transported the arrestees to the St. Louis County Detective Bureau. The St. Louis County Detective Bureau Offices on South Central Avenue do not have booking facilities. [Tr. 38]. In St. Louis County, the Department of Justice Services, located on Forsyth Avenue, in Clayton, books arrestees. The Department *1575 of Justice Services is a separate agency from the St. Louis County Police and is in a separate building. [Tr. 20, 28-29].
The St. Louis County Police procedure is for the arresting officers to inventory the property seized. Thereafter, they transfer the property and the prisoners to Justice Services for booking. Justice Services signs for the inventoried property received. [Tr. 28-29]. Justice Services fills out the booking sheet for incarceration of the prisoners. [Tr. 38]. Justice Services then transfers the prisoners to the appropriate jurisdiction within St. Louis County. [Tr. 20].
While expressing some doubts about the inventory procedures of the St. Louis County Police, this Court finds that those procedures are in fact valid standardized inventory procedures of the type approved in Illinois v. Lafayette, 462 U.S. 640, 103 S.Ct. 2605, and South Dakota v. Opperman, 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976). This Court also finds that the police searched Woolbright's luggage pursuant to those procedures. Further, this Court finds that, as applied to Woolbright, the police conducted the inventory search of his luggage in a reasonable manner. Finally, this Court finds that, even if the police search of Woolbright's luggage was an illegal, warrantless, non-inventory search, the evidence seized is nevertheless admissible under the "inevitable discovery" exception to the exclusionary rule.
Woolbright and his companions were arrested on probable cause for the murder of the same woman. The police were entitled to conduct a reasonable investigation after the arrest of these four persons to determine which ones were responsible for or participated in the murder of Amy Creeley. The police could hold the suspects in custody for a reasonable time during this investigation. The police were not required to book and incarcerate all four immediately upon arrival at the police station. United States v. Jones, 759 F.2d 633, 637 (8th Cir.), cert. den., ___ U.S. ___, 106 S.Ct. 113, 88 L.Ed.2d 92 (1985). See United States v. Boyer, 574 F.2d 951, 955 n. 10 (8th Cir.), cert. den., 439 U.S. 967, 99 S.Ct. 457, 58 L.Ed.2d 426 (1978) (the arresting officers have an obligation to question the arrestee).
In Brown v. Illinois, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975) and in Dunaway v. New York, 442 U.S. 200, 215-216, 99 S.Ct. 2248, 2258, 60 L.Ed.2d 824 (1979), the Supreme Court "disapproved arrests made for `investigatory' purposes on less than probable cause." 442 U.S. at 215, 99 S.Ct. at 2258. In United States v. Jones, 759 F.2d 633 (8th Cir.), cert. den., ___ U.S. ___, 106 S.Ct. 113, 88 L.Ed.2d 92 (1985), the Eighth Circuit stated that police may arrest suspects upon probable cause for the purpose of custodial interrogation and that the police are not required to book these arrestees. Id. at 637. See Washington Mobilization Committee v. Cullinane, 566 F.2d 107, 123 (D.C.Cir.1977). An arrestee's protections against being held "incommunicado" are his Miranda rights and his right to be promptly arraigned. See United States v. Thurmond, 541 F.2d 774 (8th Cir.1976), cert. den., 430 U.S. 933, 97 S.Ct. 1556, 51 L.Ed.2d 778 (1977). Booking is only an incidental administrative step. 462 U.S. at 644, 103 S.Ct. at 2608.
If the police are not allowed to arrest and investigate without booking arrestees, then police will book and incarcerate all arrested persons immediately and search immediately all possessions that they lawfully seize pursuant to the arrest. United States v. Johns, 469 U.S. 478, ___, 105 S.Ct. 881, 887, 83 L.Ed.2d 890 (1985). "This result would be of little benefit to the person whose property is searched...." Id. Police investigation after the arrest of the suspect, but before booking, can result in the release of the suspect without the filing of any charges.
In order to avoid booking and incarcerating persons unrelated in fact to the murder, Officer Nisbet properly interviewed the four arrestees seriatim. Through the interviews Officer Nisbet determined that Steven Wilson murdered Amy Creeley, that Jerry Woolbright supplied Wilson with the means, cocaine, to murder Creeley, and *1576 that both Woolbright and Midnight Bobby Dolan (the man with the purple hair) participated in the disposal of the dead body. Thus, it was only by midmorning on May 20, 1986, that Police Officer Nisbet knew on what charges to book Wilson, Dolan and Woolbright respectively. By that time, Nisbet also determined that Randle was not involved in Amy Creeley's death and should be released.
This Court finds that at 4:15 a.m., on the basis of the probable cause to arrest, the police could have searched Woolbright's luggage pursuant to an inventory search and could have booked him for suspicion of murder. 462 U.S. at 648, 103 S.Ct. at 2610. It would be ludicrous for this Court to find that at 11:00 a.m., after the police had determined Woolbright's exact involvement in the murder, that police could not inventory Woolbright's property and book him on state charges for supplying the cocaine used to murder Amy Creeley and perhaps for accessory to murder, obstructing justice, transporting a dead body, or misprision of felony. An inventory search is not unreasonable merely because it is not made as soon as possible. United States v. Johns, 469 U.S. 478, 486, 105 S.Ct. 881, 887, 83 L.Ed.2d 890 (1985) (3 day delay in the warrantless inventory search of a vehicle was not necessarily unreasonable); Cardwell v. Lewis, 417 U.S. 583, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974); Cooper v. California, 386 U.S. 58, 87 S.Ct. 788, 17 L.Ed.2d 730 (1967). However, if the seven (7) hour delay was without justification, it might render the inventory search prior to jailing unreasonable.
From 4:15 a.m. to 6:00 a.m., Officer Nisbet interviewed Lisa Randle and Midnight Bobby Dolan. From 6:00 a.m. to 8:00 a.m., Woolbright was at the hospital. From 8:00 a.m. to 10:00 a.m., Officer Nisbet and FBI Agent Crowley interviewed Steven Wilson. By 11:00 a.m., Officer Nisbet had completed the interviews and had determined the appropriate disposition of each prisoner. Officer Nisbet still had probable cause to incarcerate Woolbright. Therefore, an inventory search of Woolbright's possessions would be permissible so long as it was conducted in accordance with St. Louis County Police standardized procedures. See United States v. Johns, 469 U.S. 478, ___, 105 S.Ct. 881, 887, 83 L.Ed.2d 890 (1985). Officer Nisbet proceeded to inventory Woolbright's property.
"[The] inventory search is not an independent legal concept but rather an incidental administrative step following arrest and preceding incarceration." 462 U.S. at 644, 103 S.Ct. at 2608. If it is permissible to incarcerate a prisoner and if the police are going to incarcerate the prisoner, then the police can inventory his possessions. 462 U.S. at 648 & n. 3, 103 S.Ct. at 2611 & n. 3. The standardized inventory procedure should take place "as soon as reasonable after reaching the station house." 462 U.S. at 646, 103 S.Ct. at 2609. This Court finds that the inventory search of Woolbright's property at 11:00 a.m.after the police determined Woolbright's actual involvement in the death of Amy Creeley was within a reasonable time after Woolbright reached the station house. The Court finds that the seven (7) hour delay between arrival at the police station and the commencement of the inventory/booking process was justified and reasonable.
At 11:00 a.m., Officer Nisbet began processing Woolbright on the state charges. Pursuant to St. Louis County Police procedures he inventoried the property of Woolbright at the Detective Bureau. He could not book Woolbright contemporaneously because the Detective Bureau did not have booking facilities. Officer Nisbet complied with the St. Louis County standardized inventory procedure. [Tr. 28]. After the completion of the inventory search, Officer Nisbet released Woolbright to the FBI for the filing of federal drug charges. Officer Nisbet chose not to transfer Woolbright to Justice Services for booking. Officer Nisbet stopped processing Woolbright on the state charges.
An inventory search can reveal contraband unrelated to the charges on which the suspect was arrested. In Illinois v. Lafayette, Lafayette was arrested for breach of the peace. The inventory search revealed amphetamines. Illinois prosecuted Lafayette *1577 for possession of amphetamines. 462 U.S. at 642, 103 S.Ct. at 2607. Illinois was not required to prosecute Lafayette on the breach of the peace charges. Officer Nisbet inventory searched Woolbright's luggage in order to commence processing him on state charges. Upon discovery of the drugs, Officer Nisbet chose not to proceed with the state charges. Rather, the United States proceeded against Woolbright on federal drug charges.
The purposes of a standardized inventory search are to remove dangerous items from the property, to deter police thefts or false claims of theft, to deter claims that the police did not seize the particular items from the arrested person, and to prevent mishandling of articles taken from the arrested person. 462 U.S. at 646, 103 S.Ct. at 2609. Contrary to the Magistrate's assertion, all of these interests are applicable in the present case. The inventory search is conducted because of the potentiality of dangerous items, thefts, false claims, and mishandling, and not because of the actuality of anticipation or occurrence of these events in a particular case. "It is immaterial whether the police actually fear any particular package or container," or anticipate any thefts, false claims, or mishandling; "the need to protect against such risks arises independently of a particular officer's subjective concerns." 462 U.S. at 646, 103 S.Ct. at 2610.
This Court notes that to effectuate better the policies of Illinois v. Lafayette, the inventory search and the booking might occur substantially contemporaneously at the same police facility. However, the fact that the inventory search occurred at the Detective Bureau and the fact that the booking occurred at the Justice Services do not render the search either not an inventory search or an unreasonable inventory search. Perhaps immediate and contemporaneous booking and inventory would be better and less intrusive. But the fact that the search could "have been accomplished by `less intrusive' means does not, by itself, render the search unreasonable." 462 U.S. at 648, 103 S.Ct. at 2610, quoting Cady v. Dombrowski. "[Courts] are hardly in a position to second guess police departments as to what practical administrative method will best deter theft by and false claims against its employees and preserve the security of the station house." 462 U.S. at 648, 103 S.Ct. at 2610.
Assuming arguendo that the failure to book Woolbright on state charges contemporaneously with the search renders the search a non-inventory search, this Court finds that, under the "inevitable discovery" exception to the exclusionary rule, the evidence seized from the luggage is nevertheless admissible. Nix v. Williams, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984); see United States v. Andrade, 784 F.2d 1431 (9th Cir.1986); cf. United States v. Rabenberg, 766 F.2d 355 (8th Cir.1985) (once property is lawfully seized by police and taken into police custody, a reasonableness standard governs subsequent police searches).
The "inevitable discovery" doctrine is an exception to the exclusionary rule. Nix v. Williams, 467 U.S. at 440-450, 104 S.Ct. at 2507-13. For the "inevitable discovery" exception to apply, the Government must show by a preponderance of the evidence that the evidence seized would have been discovered by lawful means. Nix v. Williams, 467 U.S. at 444, 104 S.Ct. at 2509; United States v. Andrade, 784 F.2d at 1433. This Court recognizes that "inevitable discovery" cannot be used to validate an unreasonable inventory search. See United States v. Rabenberg, 766 F.2d 355 (8th Cir.1985). However, "inevitable discovery" applies if Officer Nisbet's search was not an inventory search. If the search was not an inventory search, then it was an illegal, warrantless search in violation of the Fourth Amendment. The "fruits" of the search normally would be suppressed pursuant to the exclusionary rule. This Court finds that if Officer Nisbet had not searched Woolbright's luggage, then Officer Nisbet would have transferred Woolbright to Justice Services for booking on state charges. Justice Services would have conducted a lawful inventory search contemporaneously with the booking. Woolbright's drugs *1578 would have been discovered. Thus, the evidence seized from Woolbright's luggage is admissible under the "inevitable discovery" exception to the exclusionary rule, even if the evidence was illegally seized during a warrantless non-inventory search. Nix v. Williams, 467 U.S. at 444, 104 S.Ct. at 2509; United States v. Andrade, 784 F.2d at 1433; see United States v. Apker, 705 F.2d 293, 307 (8th Cir.1983) (Eighth Circuit adopts inevitable discovery rule prior to Nix v. Williams).
In order to see an inventory search in proper perspective, it is necessary to study the evolution of interests along the continuum from arrest to incarceration. We have held that immediately upon arrest an officer may lawfully search the person of the arrestee; he may also search the area within the arrestee's immediately control....
At the station house, it is entirely proper for police to remove and list or inventory property found on the person or in the possession of an arrested person who is to be jailed.
Illinois v. Lafayette, 462 U.S. at 644-646, 103 S.Ct. at 2608-09 (1983) (citations omitted). Once a person has been arrested for a crime for which he will be incarcerated, his property will be searched. Any contraband will certainly be discovered. Nix v. Williams, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984); United States v. Andrade, 784 F.2d at 1433. See Illinois v. Lafayette, 462 U.S. at 648 n. 3, 103 S.Ct. at 2611 n. 3.[2]

LISA ANNE RANDLE
Defendant Randle moved to suppress statements which she made in the early morning hours after her arrest and after she slept at the Detective Bureau. The police Mirandized her on arrest. The police did not readvise her of her constitutional rights when she awoke. The Government concedes that when she was arrested she was under the influence of narcotics and could not knowingly understand her Miranda rights. Thus, the reading of her Miranda rights was a nullity. Accordingly, the statements made before Randle slept are hereby suppressed. The statements made after Randle slept are hereby suppressed because the earlier reading of her Miranda rights was a nullity, and she was not readvised of her rights.
Defendant Randle moved to suppress evidence seized from her possession at the time of her arrest. The Magistrate determined that the police did not seize any evidence from Randle and recommended denying the motion on that basis. This Court agrees.
The police seized luggage from Woolbright's possession. They did not seize any luggage from Randle. Prior to the police inventory of the luggage seized from Woolbright's possession, Lisa Randle made a statement to the police identifying a blue Oleg Cassini bag as her property. [Tr. 28]. However, the police conducted the search of the blue Oleg Cassini bag as part of the inventory of the property seized from Woolbright's possession. The police lawfully searched the bag. Illinois v. Lafayette, 462 U.S. 640, 648, 103 S.Ct. 2605, 77 L.Ed.2d 65 (1983). The bag was not searched in response to Randle's statements. Therefore, the evidence seized from the bag is not "fruit" of Randle's statements. Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Therefore, defendant Randle's motion to suppress the evidence discovered in that search is hereby denied. As noted above, Randle's identification statement must be suppressed. Thus, in order to *1579 inculpate Randle with respect to the contents of that bag, the Government will have to prove Randle's connection to the bag independent of her suppressed statements.

ORDER
Pursuant to the memorandum filed herein this day and upon review of the record, the Magistrate's reports and recommendations, and the objections thereto,
IT IS HEREBY ORDERED that the Magistrate's recommendations are accepted in part and denied in part.
IT IS FURTHER ORDERED that defendant Woolbright's motion for discovery and favorable evidence be and is denied as moot.
IT IS FURTHER ORDERED that defendant Woolbright's motion to dismiss the indictment be and is denied.
IT IS FURTHER ORDERED that defendant Woolbright's motion to suppress evidence be and is denied.
IT IS FURTHER ORDERED that defendant Randle's motion for production of statements and reports of witnesses be and is denied as moot.
IT IS FURTHER ORDERED that defendant Randle's motion for disclosure and production of names of witnesses be and is denied.
IT IS FURTHER ORDERED that defendant Randle's motion for production of favorable evidence be and is denied as moot.
IT IS FURTHER ORDERED that defendant Randle's motion for discovery be and is denied as moot.
IT IS FURTHER ORDERED that defendant Randle's motion for discovery of impeaching evidence be and is denied.
IT IS FURTHER ORDERED that defendant Randle's motion to disclose the identification of informant be and is denied as moot.
IT IS FURTHER ORDERED that defendant Randle's motion for production of electronic surveillance and wiretapping materials be and is denied as moot.
IT IS FURTHER ORDERED that defendant Randle's motion to sever be and is denied.
IT IS FURTHER ORDERED that defendant Randle's motion for leave to file additional and supplemental motions be and is denied without prejudice at this time.
IT IS FURTHER ORDERED that defendant Randle's motion for production and inspection of grand jury transcripts or reports be and is denied except for those materials that the Government has agreed to produce.
IT IS FURTHER ORDERED that defendant Randle's motion to suppress evidence be and is denied.
IT IS FURTHER ORDERED that defendant Randle's motion to suppress statements be and is granted.
NOTES
[1] Defendant Woolbright is a diabetic.
[2] But cf. People v. Laiwa, 34 Cal.3d 711, 195 Cal.Rptr. 503, 669 P.2d 1278, 1288 (1983) (an "accelerated booking search" occurs when a suspect is arrested on a felony charge, the suspect will inevitably be jailed, the suspect's possessions would have been searched as part of the booking process, but the suspect's possessions are searched prior to booking. Held: "an `accelerated booking search' is not a permissible exception to the warrant requirement of Article I, Section 13, of the California Constitution.") and People v. Dougall, 126 Misc.2d 125, 481 N.Y.S.2d 278 (N.Y.Sup.Ct.1984) (suspect was arrested and taken into police custody. While enroute to the police station, the officer searched the suspect's bag. Held: the search was illegal because it was not a search incident to arrest and it was not an inventory search at the police station.)